Filed 6/21/13  In re D.D. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re D. D. et al., Persons Coming Under the Juvenile Court Law. | |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES, | C072125 |
| Plaintiff and Respondent, | (Super. Ct. Nos. J35568, J35569) |
| v. | |
| JENNIFER D., | |
| Defendant and Appellant. | |

Jennifer D. (mother) appeals from the juvenile court's order denying her petition to reinstate reunification services as to minors D. D. and P. D.  (Welf. & Inst. Code,[1] § 388.)  We affirm.

---

[1]     Undesignated section references are to the Welfare and Institutions Code.

FACTUAL AND PROCEDURAL BACKGROUND

On November 10, 2010, the Butte County Department of Employment and Social Services (the department) filed section 300 petitions as to D. D., age 9, and P. D., age 10. The petitions, as later amended, alleged:  (1) Mother was found unconscious and transported to the hospital.  Law enforcement officers determined (though mother denied it) that she had attempted suicide by overdosing on methamphetamine, prescription medications, opiates, and marijuana, and had left a note.  (2)  Mother had left the minors in the care of her new husband, who had an extensive criminal history and no legal standing to care for the minors.[2]  (3) Mother told the social worker she did not think what she had done was wrong and did not see what the "big deal" was.

The detention report alleged that mother had multiple referrals to Child Protective Services (CPS) in 2000 and 2001 based on alleged drug use and general neglect.  The minors' older sister, K. D., was reported as a possible subject for detention, but she was not at the family home when her brothers were detained and her whereabouts were unknown.[3]

According to a jurisdiction report dated January 26, 2011, since the minors' detention mother had failed to participate in offered services, had continued to test positive for methamphetamine and ecstasy, and had missed drug tests.  Robert L., mother's husband according to the section 300 petitions, was actually her boyfriend.  He had offered to care for the minors, but was told he had no legal rights to them.

The jurisdiction/disposition report, dated March 10, 2011, recommended continued foster care for the minors and reunification services for mother, although mother had made minimal progress so far.  She acknowledged a substance abuse problem

---

[2]     D. D.'s and P. D.'s alleged fathers have not appeared in these proceedings.

[3]     K. D. later declined foster care in writing.

and said she would participate in inpatient rehabilitation, but had not used the services available to her and had tested positive for drugs as recently as February 25, 2011. Her substance abuse and depression severely impacted her ability to benefit from services.

Mother's boyfriend, Robert L., had a criminal history dating back 33 years, including drug and child cruelty offenses.[4] He was awaiting sentencing on his latest convictions. Mother recognized that she might have to put her relationship with him aside to focus on recovery.

Mother had supervised visitation with the minors once a week. She had missed or been late for numerous visits. The location of visits had been changed because Robert L. was making unauthorized contacts with the minors. Mother insisted he was an important part of their lives.

The minors were doing well in school and had the support of extended family members. They wanted to return to mother's care, but had difficulty recognizing the depths of her addiction and seemed to perceive her inconsistent visitation as abandonment.

At the jurisdiction/disposition hearing on March 10, 2011, the juvenile court ordered continued foster care for the minors and reunification services for mother. The court found her progress to date poor, due to inconsistent participation in services and visitation and continued use of illegal substances.

The six-month status review report recommended granting further services to mother, though her participation in services was "minimal." Her visitation, though more consistent, was still supervised because of persistent lateness, failure to test for drugs, and lack of progress in services. The visits went well, but she related to the minors more as a peer than as a parent.

---

**4** Mother said she and Robert L. married in October 2010, but neither had responded to requests to verify this claim.

Mother became homeless around June 2011. She and Robert L. stayed in motels or camped. Neither was gainfully employed. She felt that her lack of housing and income impeded her participation in services.

Since mother's relationship with Robert L. began, she lost custody of the minors, succumbed to addiction again, became estranged from her eldest daughters and extended family members, lost her job and home, and developed "severe health complications that are exacerbated by what appears to be her continued drug abuse." She periodically acknowledged that she needed to focus on her health and it might be better if she and Robert L. separated.

On the other hand, mother had previously maintained sobriety for eight or nine years, given the minors adequate housing, structure, and guidance, and worked at various jobs, including some in "the social services field." She had expressed difficulty "facing service providers as a recipient instead of as one of their peers/co-workers." She and the minors clearly loved each other, and they wanted her to get better and to be a parent to them again.

The minors were doing well in foster care. They had formed appropriate bonds with their foster parents and looked to them for support and guidance. At the six-month review hearing, the juvenile court ordered continued services to mother. The 12-month status review report recommended terminating mother's services and setting a section 366.26 hearing.

Mother had been mostly out of contact with the department while living a transient life with Robert L., even after she reported on October 11, 2011, that he had become violent with her, sabotaged her visitation, and caused her to fear for her safety. She knew he was wanted on felony arrest warrants and had fled the police three times since September 22, 2011. She was observed in his company or in the vicinity on all three occasions, until he was captured around November 16, 2011. The next day, she entered a women's shelter.

4

Even after mother entered the shelter, her attendance at services was spotty or undocumented. Visitation had resumed and had taken place weekly, supervised, since November 29, 2011. Mother still did not have housing suitable for the minors.

It had taken mother 12 months to recognize the destructive pattern of domestic violence in her relationship with Robert L. Her progress had not been sufficient to return the minors to her care.

The minors, who had been in their foster home for 14 months, had adjusted very well and had formed appropriate attachments there. An adoptions referral had been completed and the case had been assigned to an adoptions specialist.

Before the 12-month hearing, mother filed exhibits, including 12-step program attendance logs, certificates of completion from Stepping Stones (a substance abuse program) and Counseling Solutions (parent support group), a support letter from a Narcotics Anonymous member, a letter from a therapist saying that mother had begun seeing him voluntarily, and a referral to parenting classes and individual counseling.

At the contested 12-month review hearing, after hearing testimony from mother and receiving her exhibits into evidence, the juvenile court terminated her services and set a section 366.26 hearing. The court found by clear and convincing evidence that mother's progress had been poor and there was no substantial probability the minors could be returned to her care by the 18-month review hearing.

On June 27, 2012, mother filed a section 388 petition seeking the reinstatement of reunification services and increased visitation. The petition alleged that since the termination of her services mother had stayed sober and sought out random drug testing, maintained regular attendance at 12-step meetings, continued to participate voluntarily in Stepping Stones, met consistently with her private therapist to work on codependency and addiction, met with her social worker to try to alleviate the department's concerns, and completed all available parenting classes. Furthermore, Robert L., incarcerated since November 2011, was about to be sentenced to prison. In counseling, mother continued to

5

address the negative impact her relationship with him had had on the minors, and she believed therapeutic visits with them would be helpful on this issue.

On July 9, 2012, mother filed an amended section 388 petition, alleging in addition that she had obtained stable housing and had enrolled in and begun attending Butte College.

The juvenile court scheduled the amended section 388 petition to be heard along with the section 366.26 proceeding, but the petition was heard alone on August 23, 2012, because the section 366.26 proceeding had to be continued. Mother and the minors' court appointed special advocates testified.

Mother testified as follows:

She had been sober since November 10, 2011. She tried to attend at least two Narcotics Anonymous meetings a week, while also going to school; when not in school, she would go to a meeting almost every day. She attended church and a church-based program called Celebrate Recovery. She had obtained a new sponsor in March or April 2012 (because the old one had not been able to work with her), met with her weekly, and did "step work" with her. She had done five drug tests after her services were terminated; all were negative.

Mother had also done "a lot of AA" because it fit into her schedule when she was in Stepping Stones. She did Stepping Stones from the end of November 2011 until June 9, 2012, when she stopped attending because it conflicted with her school schedule.[5]

---

[5] Mother attended a four-days-a-week summer session from June 12 through July 19. Shortly before the date of this hearing, she began the fall session, in which she was enrolled in five classes and attended five days a week. Her goal in school was "something to do with law"; more specifically, she hoped to find a way to use her prior experience in alcohol and drug treatment in conjunction with legal training, possibly to get a job as a case manager or substance abuse counselor. The summer courses she took included "Geography of California, Magic, Witchcraft, and Religion, and Health and Wellness."

She had prepared a "safety plan" before quitting Stepping Stones and had followed through with it.

To deal with her health problems after she got sober, she began seeing her physician at least once a month. She also saw a cardiologist every two months, and the heart condition she had developed the previous year was now much improved. Through her physician, she requested and obtained a "tele-site appointment" with a psychologist.

Mother had no current untreated mental health issues. She sometimes felt "mad" or "sad" due to her situation, but had no diagnosis. Her physician prescribed "Lamic[t]al" three months ago to deal with these emotions. She took no other medication except for her blood pressure. She was not seeing anyone for individual therapy because her school schedule did not leave time, but she was looking into trying to see someone at the women's shelter where she had lived until May 1, 2012. She was presently seeing a counselor there on a weekly basis, talking about adjustment problems and relationships.

When mother left the shelter, she moved into an apartment. She had a month-to-month lease, but believed she could stay "as long [as] the building is standing" because she had known the manager and the manager's children for a long time and the manager wanted to help her reestablish her credit and rental history.

Mother had stopped seeing Robert L. She last visited him in April 2012 and told him they could not continue their relationship. When his son died in June, she spoke to him and gave him support about that. But she had asked him to "parole to some other county which is down south somewhere" when he finished serving his term.

After her services were terminated, mother attended three different parenting classes, one an eight-week program and the others either six or eight weeks.

---

Asked why she had not gone back to Stepping Stones after completing the summer session, mother said that she would have had to quit again when the fall session began on August 20 because the only available group would have conflicted with her school schedule.

7

If her services were reinstated, she would be willing to do anything prescribed. She had looked into what was available at her campus (where she now went four days a week), and she knew the options offered by Butte County.

Being able to discuss with the minors their feelings about what had happened would be really important, because they had not had that opportunity: her requests for therapeutic sessions with them had been denied, despite their counselor's support for the idea.[6] Although the juvenile court had granted the department discretion to provide therapeutic counseling, it had not done so; she would like a court order mandating the department to do so, even if her services were not reinstated.

Visitation had been reduced as of April or May 2012 from weekly to monthly. She had received additional brief visits on mother's day and on the day P. D. graduated from sixth grade. She understood the protocol about what could and could not be said during visits, but felt frustrated that she could not tell the minors she was doing well; she also wondered how they could believe that she was doing well when she was allowed to see them only once a month. Nevertheless, the visits were "always great"; she had "a really good bond" with the minors and always brought things for them to do. She would like visits to be increased to at least once a week, if possible by participating in the minors' activities (such as attending P. D.'s football games).

Mother did not get to talk much with the minors about the foster parents, but she felt that they enjoyed spending time with the foster father because they had not had an adult male presence in their lives for 10 years. She would "absolutely" support the

---

**6** The minors' counselor thought D. D. had trouble expressing his feelings, but mother believed that the counselor felt therapeutic sessions would benefit him anyway. Mother did not think it would give the minors false hope about going home if such sessions were instituted but her services were not reinstated.

minors' relationship with the foster parents, even if the minors were returned to her custody.

Amanda McNulty, D. D.'s court appointed special advocate, testified that therapeutic counseling would not be in D. D's best interest at this time. McNulty thought he was not emotionally ready to express his feelings toward mother and she might not be receptive to what he would say. He had told McNulty that he wanted to see mother more, but did not want to go home to her. Having supervised a visit and seen the dynamics between mother and D. D., McNulty doubted that he would have the strength to confront her.

Rita Puelicher, P. D.'s court appointed special advocate, testified that therapeutic counseling would not be in P. D.'s best interest at this time. Like D. D., he did not express emotions well. He wanted to stay with his foster parents. He enjoyed mother's visits, but did not want them to be increased.

After hearing argument, the juvenile court denied mother's section 388 petition. The court found mother had not provided sufficient evidence that her circumstances had changed or that it would be in the minors' best interest to give her more services. Specifically, the court was concerned that mother had chosen to discontinue Stepping Stones and counseling so that she could focus on school, "in light of her history and not participating in services for an entire year and when these boys were first detained." The court was also concerned that mother had continued to have contact with Robert L. even beyond April 2012, when she claimed she had ended their relationship: her knowledge that his son had died and he was having emotional difficulty with that showed that she had not been able to cut him completely out of her life, "which should have been done

probably in February when the Court terminated services due to [the] choices she was making."**7**

## DISCUSSION

Mother contends the juvenile court abused its discretion by denying her section 388 petition. We disagree.

A petition to modify a juvenile court order under section 388 must factually allege the existence of new evidence or changed circumstances; it must also allege that the proposed modification will serve the minors' best interests. (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 672.) The petitioner has the burden of proof on both points by a preponderance of the evidence. (Cal. Rules of Court, rule 5.570(h)(1)(D).) In assessing the petition, the court may consider the entire history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188-189.)

To decide whether a parent has met her burden under section 388, the juvenile court must consider such factors as the seriousness of the problem that led to the dependency, and the reasons for the problem's continuation; the degree to which the problem may be and has been removed or ameliorated; and the strength of the relative bonds between the dependent child and the child's parents or caretakers. However, this list is not exhaustive. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1229; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531-532.)

When a parent brings a section 388 petition after a section 366.26 hearing has been set, the best interests of the child are of paramount importance. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Therefore, the juvenile court looks not to the parent's

---

**7** The court then granted mother's request to give the department discretion to increase visitation and to begin therapeutic counseling with the minors if their therapist thought that would be in their best interest.

interest in reunification but to the child's need for permanence and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

We review a ruling denying a section 388 petition for abuse of discretion. (*In re S.R.* (2009) 173 Cal.App.4th 864, 866.) We reverse only if the ruling exceeded the scope of the juvenile court's discretion, or if under all of the evidence, viewed most favorably to the ruling, no reasonable judge could have made that ruling. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

Here, the juvenile court found mother had failed to show changed circumstances, citing two facts: (1) the fact that she stopped participating in Stepping Stones and engaging in counseling so that she could attend school, and (2) the fact that she failed to break off all contact with Robert L. -- who physically abused her and fostered her continued substance abuse -- immediately after his latest incarceration. Given mother's history of addiction and of failing to participate in services for a year after the minors were removed from her custody, the court could reasonably conclude from this evidence that mother was still minimizing the problems that led to the dependency and then prevented her from recovering custody. So long as she did not put her recovery first and act decisively to remove any obstacles (e.g., by promptly ending her self-destructive relationship with Robert L.), the danger of yet another relapse was real. Furthermore, although mother had participated in 12-step groups and counseling, done drug testing, and acquired housing, she had not yet shown any evidence that she could avoid falling into another relationship as unhealthy as the one she claimed to have just left. In light of the entire history of the case (*In re Justice P., supra*, 123 Cal.App.4th at p. 189), substantial evidence supported the juvenile court's finding that mother's circumstances, though changing, had not changed sufficiently to satisfy section 388 (see *In re Casey D.* (1999) 70 Cal.App.4th 38, 470).

But even if mother showed changed circumstances, she did not show that it would be in the minors' best interest to reinstate her reunification services. A section 366.26

11

hearing had been set (and, if not continued, would have been held immediately after the section 388 hearing).  The minors were adoptable and were happily placed with foster parents who wanted to adopt them.  The minors' court appointed special advocates testified that the minors wanted to stay in that home, not to return to mother's care.  When a case has reached this stage, the minors' interest in permanence and stability outweighs a parent's interest in reunifying.  (*In re Marilyn H., supra*, 5 Cal.4th at p. 309.)  Reinstating mother's services at best would delay the achievement of permanence and stability for the minors, and at worst could create an emotionally damaging conflict of loyalties for them.  For this reason as well, the juvenile court's ruling was a proper exercise of discretion.

## DISPOSITION

The order denying mother's section 388 petition is affirmed.


          ROBIE          , J.



We concur:



      HULL      , Acting P. J.



      MURRAY     , J.



12